**FILED**
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN
SEP 2 2 2005
BY_____
DEPUTY CLERK

# United States District Court
MIDDLE DISTRICT OF TENNESSEE (NASHVILLE DIVISION)

UNITED STATES OF AMERICA

V.

**CRIMINAL COMPLAINT**

TIMOTHY RYAN RICHARDS

Case Number: 05-2065 MK

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. From in or about __2000 through on or about September 21, 2005__ in __Davidson__ County, in the Middle District of Tennessee defendant did,

*Knowingly made, printed, or published, or cause to be made, printed, or published, any notice or advertisement seeking or offering (a) to receive, exchange, buy, produce, display, distribute, or reproduce, any visual depiction that involved the use of a minor engaging in sexually explicit conduct and such visual depiction was of such conduct or (b) participate in any act of sexually explicit conduct by or with any minor for the purpose of producing a visual depiction of such conduct; and*

*Knowingly mailed, transported, or shipped in interstate or foreign commerce by any means, including by computer, any child pornography, as defined in 18 U.S.C. § 2256,*

in violation of Title __18__ United States Code, Section(s) __2251(d) and 2252A(a)(1)__. I further state that I am a __Task Force Officer with the Violent Crimes Task Force of the FBI__ and that this complaint is based on the following facts:

See Attached Affidavit

Continued on the attached sheet and made a part hereof: ■ Yes ☐ No

_____
Signature of Complainant
C. Ricky Roll, TFO FBI

Sworn to me and subscribed in my presence,

September 22, 2005                                    at    Nashville, Tennessee
Date                                                              City and State

E. Clifton Knowles, United States Magistrate Judge    _____
Name & Title of Judicial Officer                                Signature of Judicial Officer

# Attachment

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT

I, C. Ricky Roll, being first duly sworn, do depose and state:

1. I have been employed as a police officer with the Metropolitan Nashville Police Department for 28 years. I currently am assigned to the Federal Bureau of Investigation's Violence Crimes Task Force in Nashville, Tennessee, where I have been working for 11 years.

2. I am currently assigned to investigate a variety of criminal violations involving the Sexual Exploitation of Children, including violations of 18 U.S.C. §§ 2251(d) and 2252A. During my tenure as an Task Force Officer with the Violent Crimes Task Force of the FBI, I have conducted multiple investigations involving violations of federal law. I have gained experience through some of these investigations regarding the possession, manufacture and distribution of child pornographic images. During the investigation of these kinds of cases, I have executed, or participated in the execution of, numerous arrest and search warrants, and seized evidence of criminal violations. In addition, I have received formal training from both FBI and other law enforcement agencies in the area of child pornography and child exploitation investigations. Based on my training and experience, I have become familiar with the methods, operations, and schemes commonly used by individuals involved in the violations of the federal child pornography statutes.

3. As a task force officer with the FBI, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with authority to execute warrants issued under the authority of the United States.

4. This affidavit is being submitted in support of a Criminal Complaint for the arrest of TIMOTHY RYAN RICHARDS. Since this affidavit is being submitted for the limited purpose of securing an arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that TIMOTHY RYAN RICHARDS has committed violations of Title 18, United States Code, Sections 2251 and 2252A.

5. Based upon the information summarized in this affidavit, there is probable cause to believe that TIMOTHY RYAN RICHARDS has committed violations of Title 18, United States Code, Sections 2251 and 2252A.

6. The factual information supplied in this affidavit is based upon investigation to date by Special Agent Monique Winkis of the FBI in this matter to date. Special Agent Winkis has been an agent with the FBI for over ten years. Special Agent Winkis is currently assigned to the Cyber Division, Innocent Images Unit out of FBI Headquarters. Special Agent Winkis is assigned investigations involving the Sexual Exploitation of Children, including violations

1

of Title 18, United States Code, Sections 2251 and 2252A. The investigation also includes information from other Special Agents of the FBI, members of other law enforcement agencies, and others including a male "Justin" and a cooperating witness (CW1), both described in more detail below. It also is based on my own experience, training, and background as a Task Force Officer with the FBI's Violent Crimes Task Force.

## BACKGROUND REGARDING COMPUTERS, THE INTERNET, AND EMAIL

7. I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience and knowledge, I know the following:

8. The term "computer" as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.

9. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. They have also revolutionized the way in which child pornography collectors interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies.) The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

10. The development of computers has added to the methods used by child pornography collectors to interact with and sexually exploit children. Computers serve four functions in connection with child pornography. These are: production, communication, distribution, and storage.

11. Pornographers can now produce both still and moving images directly from a common video camera called a web camera. The camera is attached using a cable, directly to the computer using a device called a video capture board. This device turns the video output into a format is usable by computer programs. The output of the video camera can be stored, manipulated, transferred or printed directly from the computer. The captured image can be edited in very similar ways to a photograph. The image can be lightened, darkened, cropped, and manipulated in a wide variety of ways. The producers of child pornography can also use a device known as a scanner to transfer photographs into a computer-readable format. As a result of this technology, it is relatively inexpensive and technically easy to produce, store

2

and distribute child pornography. There is the added benefit to the pornographer that this method of production does not leave as large a trail for law enforcement to follow as have been used in the past.

12. Previously, child pornography collectors had to rely on personal contact, U.S. mail, and telephonic communications in order to sell, trade or market pornography. The development of the computer, and particularly the Internet, has also changed that.

13. The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities. With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world. Many individual computer users and businesses obtain their access to the Internet through businesses known as Internet Service Providers ("ISPs"). ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or companies that have subscriber accounts with the ISP. Those records may include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, Internet Protocol addresses,[1] and other information both in computer data format and in written record format.

14. Some ISPs offer their subscribers the ability to communicate publicly or privately with each other in real time in the form of "chat rooms." Aside from "chat rooms" that reside on many ISPs' internal networks, these ISPs allow access to a larger external network of chat channels, one of which is called Internet Relay Chat (IRC), that is accessed through intermediary or "client software". Contact with other users in either of these "internal" or "external" online formats can be very open or anonymous - in front of everyone else who happens to be in the same room/channel at the same time, or very private and personal in the form of person to person instant messages.

15. These communication structures are ideal for the child pornography collector. Having both open as well as anonymous communication capability allows the user to locate others of similar inclination and still maintain their anonymity. Once contact has been established, it is then possible to send text messages and graphic images to other trusted child pornography

---

[1] The Internet Protocol address (or simply "IP" address) is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range of 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most ISPs control a range of IP addresses.

collectors. Moreover, the child pornography collector need not use the large Internet service providers. Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute pornography. These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired. All of these advantages are well known and are the foundation of transactions between collectors of child pornography.

16. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution of child pornography. For example, child pornography can be transferred via electronic mail or through file transfer protocols ("FTP")[2] or through commercial websites to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services, and easy access to the Internet, the computer is a preferred method of distribution of child pornographic materials. The popularity and expansion of commerce on the World Wide Web has also resulted in a proliferation of child pornography websites. These include websites that display and supply child pornography, as well as websites that advertise and facilitate the distribution of child pornography. For example, some websites advertise child pornography by providing free pages, also known as "preview pages" (containing images and/or videos) that include introductory images of child erotica and child pornography (commonly referred to as "teaser" images) and promise full access to the website's entire inventory of images in return of a "subscription" payment. Individuals who visit websites that contain or advertise child pornography may subscribe to the website and gain access to the members-only section/area by submitting their credit card information to a third-party credit card processor, which then processes and authenticates a "subscriber's" credit card. After the third-party credit card processor approves use of the credit card submitted, the customer is typically given a login name and a password which permits access to the website to which he subscribed. The third-party credit card processor effectively works as a middleman between the customer and the website usually taking a percentage of the subscription payments for providing its processing services.

17. The computer's capability to store images in digital form makes it an ideal repository for child pornography. A single floppy disk can store dozens of images and hundreds of pages of text. The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 100 gigabytes are not uncommon. These drives can store tens of thousands of images at very high resolution. Magnetic storage located in host computers adds another

---

[2] The File Transfer Protocol (FTP) is a protocol that defines how to transfer files from one computer to another. One example, known as "anonymous FTP", allows users who do not have a login name or password to access certain files from another computer, and copy those files to their own computer.

4

dimension to the equation. It is possible to use a video camera to capture an image, process that image in a computer with a video capture board, and to save that image by storing it in another country. Once this is done, there is no readily apparent evidence at the scene of the crime. Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail. Searching computer systems and electronic storage devices may require a range of data analysis techniques. Criminals can mislabel or hide files and directories, encode communications, attempt to delete files to evade detection, or take other steps to frustrate law enforcement searches. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

## APPLICABLE DEFINITIONS

18. The term "child pornography" as used herein, means any visual depiction the producing of which involved the use of a minor engaging in sexually explicit conduct and which is of such conduct.

19. The term "visual depiction", as used herein, is defined pursuant to Title 18, United States Code, Section 2256(5) to "include undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image."

20. The term "minor", as used herein, is defined pursuant to Title 18, United States Code, Section 2256(1) as "any person under the age of eighteen years."

21. The term "sexually explicit conduct", as used herein, is defined pursuant to Title 18, United States Code, Section 2256(2) as "actual or simulated (A) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (B) bestiality; (C) masturbation; (D) sadistic or masochistic abuse; or (E) lascivious exhibition of the genitals or pubic area of any person."

22. The term "child erotica" as used herein, means "any material, relating to children, that serves a sexual purpose for a given individual." See Kenneth V. Lanning, Child Molesters: A Behavioral Analysis (2001) at 65. Some of the more common types of child erotica include photographs that are not sexually explicit, drawings, sketches, fantasy writings, diaries, and sexual aids.

## APPLICABLE STATUTES

23. Title 18, United States Code, Section 2251(d), makes it a federal crime for any person to knowingly make, print, or publish, or cause to be made, printed, or published, any notice or advertisement seeking or offering to receive, exchange, buy, produce, display, distribute, or

5

reproduce child pornography, or seeking or offering participation in any act of sexually explicit conduct by or with a minor for the purpose of producing child pornography if the person knows or has reason to know the notice or advertisement will be transported in interstate or foreign commerce by any means, including by computer, or if the notice or advertisement is transported in interstate or foreign commerce by any means, including by computer.

24. Title 18, United States Code, Sections 2252(a)(1), and 2252A(a)(1) make it a federal crime for any person to ship or transport child pornography in interstate or foreign commerce.

## INVESTIGATION OF JUSTINSFRIENDS.COM

25. On July 25 and 26, 2005, Special Agent Monique Winkis and Special Agent Emily Vacher interviewed "Justin." "Justin" initiated contact with law enforcement through his attorney offering to provide information regarding the commercial production, advertising, sale and distribution of child pornography videos in which he had played an integral part in exchange for immunity from prosecution for his role as detailed in this affidavit. "Justin" is currently 19 years of age with a date of birth of July 24, 1986. During the times detailed in this affidavit up until approximately June of 2005, "Justin" has used drugs including marijuana and cocaine. "Justin" has provided information detailed below under a limited grant of use immunity for his statements.

26. "Justin" states that at approximately 13 years of age, he obtained an Earthlink Internet account and a web camera ("web cam"). "Justin" installed the web cam on his computer in his bedroom and started Justinscam.com (and later used the names Justinsfriends.com and Mexicofriends.com). The live web cam began showing non-pornographic video -- with "Justin" simply doing everyday things live - such as studying, sleeping, and typing at his computer. However, he immediately became the prey of older men who would contact him and pay him to engage in sexual activity such as masturbating live on the web cam. "Justin" soon developed a pay site to allow his website "clients" monthly access to his site as well as to archived videos. Initially payments to the site were made via Western Union and Paypal but were later made through a credit card payment processor called WEBCO (an unidentified website company), operated by an unidentified male (UM). According to "Justin", he built up a "client" base of thousands from around the country, generating thousands of dollars in any given month.

27. While still a minor, "Justin" established relationships with several adult men including:

   a. CW1: CW1 contacted "Justin" after viewing his website, when "Justin" was approximately 15 years old. "Justin" informed CW1 of his age. After initial contact, CW1 traveled to Mexico where "Justin" was living with his father to meet "Justin" in person. CW1 had sexual contact with "Justin" in Mexico when "Justin" was 16

6

years of age. Thereafter, "Justin" states he was repeatedly molested by CW1 on many occasions including numerous times at CW1's residence in Virginia as well as hotels in Las Vegas, Nevada, Baltimore, Maryland and Bakersfield, California.

    b. UM1 (Unidentified Male #1): "Justin" reports UM1 is a merchant account provider from the Boston, Massachusetts area and owns/operates WEBCO. UM1 set up the ability for "Justin" to have credit card processing for his website when "Justin" was approximately 15 to 16 years of age. "Justin" located UM1 via the Internet through another commercial child pornography website where UM1's company, WEBCO, was the website's payment processor. "Justin" contacted him and they formed a business relationship. "Justin" reports he established this relationship because UM1 was the only processor who would accept "Justin" as a client without providing a social security number or tax identification number. "Justin" reports UM1 knew he was a minor and was aware of the content of his website(s). UM1 is now a business associate of CW1. "Justin" reports that starting around June or July of 2005, UM1 started funneling proceeds of the Justinsfriend.com website membership subscriptions to CW1.

28. "Justin" states that when he was a minor, CW1 wanted to become partners with him because he saw how much money was being generated from the various websites which have included Justinsfriends.com and Mexicofriends.com.

29. Within months of his initial contact with him, "Justin" states CW1 became more involved in the website operations including actively producing content to make available on the websites. "Justin" reports CW1 has produced videos of minors engaged in sexually explicit conduct either by using a live web cam or digital recording technology. In particular, CW1 has produced videos of "Justin" engaged in sexually explicit conduct on many occasions when "Justin" was under the age of 18. This would frequently occur in CW1's bedroom in the subject premises. "Justin" reports that CW1 has also produced videos of "Justin" (when "Justin" was 18) and a boy known as "Taylor" who was 14 years of age at the time. "Justin" described one such video as depicting "Justin" and "Taylor" sitting side-by-side in CW1's bedroom in his Dublin residence, the subject premises, masturbating. "Justin" states the recording was accomplished by CW1. This video was then uploaded to the Justinsfriends website. This video was produced within the past year and was still depicted as a preview video on the Justinsfriends website in August of 2005.

30. "Justin" also reported that he decided in or about June or July of 2005, to discontinue his association with the Justinsfriends and related websites and the child pornography industry altogether. After this date, CW1 was still receiving payments from WEBCO from membership subscriptions to the justinsfriends website.

7

## JUSTINSFRIENDS.COM AND JUSTINSFRIENDS.NET WEBSITE

31. On July 26, 2005, Special Agent David Condo, while operating in an undercover capacity, logged onto the Internet and accessed the web page www.justinsfriends.com and was immediately directed to the website www.justinsfriends.net.

32. On July 26, 2005, Special Agent Condo made an undercover one-month membership purchase to the justinsfriends website using an undercover credit card for the amount of $29.95. The company that provided the online form for purchase into this website advertised its name as WEBCO.NET. The web page directed customers to choose a username and password for entry into the Member's Only areas. The second page Special Agent Condo was directed to listed the price of membership of $29.95 and stated that the membership would automatically renew every 30 days at a price of $24.95. It also identified the customer's Internet Protocol address and contained fields to enter the customer's credit card number and expiration date. The next two online forms contained fields to enter the customer's name, address, and credit card security code. After successfully entering all requested information on these web pages, a final webpage appeared indicating "Transaction Approved" and states "This charge will appear on your credit card statement as "WEBCO.NET." All of the forms referenced in this paragraph were labeled WEBCO.NET.

33. On July 26, 2005, Special Agent Condo accessed the Member's Area of this website and downloaded images, web pages and videos, some of which are described in further detail below.

34. Subsequent to the purchase, Special Agent Condo reviewed the undercover credit card statements for the credit card used to make the membership purchase to the justinsfriends website. The statement indicated a charge was processed for $29.95 on July 2, 2005 and listed "WEBCO.NET <undisclosed phone number> MA" under the heading "Merchant Name or Transaction Description."

35. On September 7, 2005, Special Agent Condo of the FBI accessed the Internet in an undercover capacity and visited the website located at http://www.justinsfriends.net/. The web address of http://www.justinsfriends.com redirected the user to http://justinsfriends.net/ which contained the same website.

36. The home page of this website was titled "Justin's Friends" and featured pictures of several clothed teenage males. It also contained a picture of two naked males kissing and the quote "All my friends live to you every night!".

37. A link on the home page labeled "Preview" took you to another page with several clothed pictures of a boy named Justin. This page also featured a movie file (video mpeg) that showed two males masturbating on a bed together with their genitals displayed to the camera. This individuals in this movie file have been identified as "Justin" and "Taylor" by an FBI

8

agent who has met or is otherwise sufficiently familiar with the appearance and identities. Law enforcement officers have interviewed "Taylor" and determined that he was 14 years of age at the time the movie file was produced.

38. Another link on the home page labeled "Login" prompted the visitor to enter a username and password in order to access the Members Only area of the Justins Friends website. Another link on the home page labeled "Join" directed users to a page that advertises the following options to join the site: a one-month membership at $29.99 per month, a six-month membership for $24 per month, and a one-year membership for $20 per month. Upon clicking any one of these options, the user was directed to the website at https://secure.WEBCO.net which carried the title of WEBCO.net and advertised itself as an "Authorized billing agent for JustinsFriends.net."

39. Upon clicking the "Login" link on the home page and entering a valid and username and password, Special Agent Condo was directed to a website at http://www.justinsfriends.net/members/. This web page was titled "Members Only" and contained a clothed picture of "Justin," and contained the following links:
    "ABOUT ALL OF JUSTINS FRIENDS, BIOS"
    "LIVE STREAMING CAMS"
    "PHOTO GALLERIES (XXX PHOTOS ALSO HERE)"
    "HOT STEAMY VIDEOS"
    "CHAT WITH US LIVE AND OTHER MEMBERS"
    "LINKS TO OTHER COOL SITES"
    "CONTACT TECHNICAL SUPPORT"

40. The "ABOUT ALL OF JUSTINS FRIENDS, BIOS" link leads to a page which advertises biographies for the following individuals: Justin, Brandon, Tay, James, Tim, and BeachBoys. The pages for Justin, Tay, Tim, and BeachBoys have pictures as well as biographical information about the boys. The picture on Tay's page is of a male laying on a bed with his legs spread toward the camera, his erect penis and testicles showing out of his boxer shorts, and his right hand around his penis. The page for Brandon has biographical information but no picture. The page for James was not available.

41. The "LIVE STREAMING CAMS" link leads to a page with the links of "Cam1" and "Cam2" and instructs the visitor to check either camera to see if they are live. Both links led to a page with a message saying "Justins FreeCam is offline in the meantime enjoy a prerecorded show". The video that then played on the page was of a male sitting on a chair and masturbating.

42. The website also provides a link to "HOT STEAMY VIDEOS" which then directs the viewer to the webpage titled "Archived Private Video Vault!" This web page had the following links: JUSTIN, BRANDON, TAY, JAMES, TIM, Other Friends.

9

43. Accessing the link for "JUSTIN" directs the viewer to various videos depicting "Justin" engaging in sexually explicit conduct. An FBI agent who has met "Justin" has identified the individual depicted in the video as"Justin". The investigation has also revealed that when "Justin" was depicted in the sexually explicit videos he was a minor (except for the video described above depicting"Justin" and "Taylor" together). Examples of the videos in which "Justin" was a minor include as follows:

   a. justin12.wmv – this video was advertised as "Justin12.wmv – Justin Fucks a Hoe (Part 3)." It depicts "Justin" having explicit vaginal intercourse with a female and includes multiple views of explicit penile-vaginal penetration.

   b. justing18.wmv – this video was advertised as "Justin18.wmv - Justin and Sophie." It depicts "Justin" having explicit oral and vaginal intercourse with a female and includes continuous views of the female placing "Justin"'s penis in her mouth and "Justin" penetrating her vagina with his penis.

### WEBCO/WEBCO.NET

44. The WEBCO.NET website is registered through WEBSITE (unidentified website). Information obtained pursuant to a subpoena to WEBSITE revealed that the domain name WEBCO.NET was created on January 19, 2000 and expires on January 6, 2006. The registrant is listed as WEBCO.net. The administrative and technical contacts listed is admin@WEBCO.net listing an address that has been identified as a private postal mail box provider.

45. The NOEVA.NET website advertises credit card processing stating "power your site with FusionBilling.com's ecommerce package seemlessly into your website. 12.5 - 15 % commission on all transactions. 10 % for sites hosted on WEBCO.net. 10% reserve, all reserves are paid in 6 months. Unused reserve is paid with 2.5% APY interest. All payouts are sent every Friday all year long. We pay to all countries Checks, Direct Deposit and Wire Transfers. Lower rates are available for volume processing; Contact sales@WEBCO.net. Be selling in minutes; 5 minute setup!"

46. Information obtained from the online Dunn and Bradstreet comprehensive reports indicate the Chief Executive of WEBCO.net is UM1 and that the business was started in 2000. It also lists an address of 304 Newbury St. Ste 288, Boston, MA 02115 which is the same address listed with GoDaddy and has been identified as a private postal mail box provider.

## TIMOTHY RYAN RICHARDS a/k/a "Casey"

47. On September 12, 2005, CW1 was arrested and charged with the production, distribution, sale, receipt, and possession of child pornography and has been detained in federal custody.

48. On September 20, 2005, CW1 provided information to Special Agent Winkis regarding the investigation of the justinsfriends website and the involvement of TIMOTHY RICHARDS in the distribution, sale, receipt and possession of child pornography through the Internet.[3]

49. CW1 stated TIMOTHY RICHARDS goes by the name of "Casey." CW1 stated he has been in communication on and off with RICHARDS since 1996 when CW1 was a member of RICHARDS' original website named caseysapartment.com which contained child pornography. CW1 has had sporadic contact with RICHARDS through online communications since 1996. CW1 reports RICHARDS lives with a minor boy named "Dew" who CW1 believes to be approximately 14 years old. RICHARDS told CW1 he is having sexual relations with "Dew" and has for the past two years. At the time that RICHARDS told CW1 he was having sex with "Dew," RICHARDS was an adult.

50. "Dew" has been identified and is a 13 year old boy through a "bio" that is posed on a website called myspace.com, which contains his photograph. Additionally, "Dew" told a Tennessee Department of Children's Services employee that he is 13 years old. The Tennessee Department of Children's Services confirmed that "Dew" appears to be a 13 year old child.

51. CW1 reports "Dew" was first observed by RICHARDS and CW1 in a website called "mylivewebcam.com" and recalls RICHARDS expressing when he observed "Dew's" image online, "hands off, he's mine." This occurred about two years ago when "Dew" would have been approximately 12 years of age. CW1 reports RICHARDS and "Dew" currently live together in Nashville, Tennessee.

52. CW1 states that RICHARDS has operated child pornography websites since 1996 when RICHARDS was living in Maryland. RICHARDS would "stream in" "Justin's" live shows which featured "Justin" engaging in sexually explicit conduct to his own website(s). The website(s) would advertise them and make them available through caseyandkylescondo.com. "Justin" would receive free streaming and RICHARDS would benefit from increased membership subscriptions because of these live shows.

53. CW1 reports RICHARDS has always been interested in obtaining the domain names for the justinsfriends websites because of their popularity and money-making potential. CW1

---

[3] On September 12, 2005, CW1 was arrested and charged with the production, distribution, sale, receipt, and possession of child pornography and has been detained in federal custody. CW1 has provided information under a limited grant of use immunity.

11

reports that in or around July of 2005, RICHARDS was not only hosting the website but started operating the website and receiving profits from the website's membership subscriptions. "Justin" confirms that in or around June of 2005, "Justin" was aware that an increased percentage of the proceeds from the justinsfriends website was being provided to RICHARDS by the payment processor WEBCO.net. At this time, CW1 was also receiving compensation from the site. "Justin" states when he became aware of the extent of the profits that were being funneled by UM1's company, WEBCO to RICHARDS, he communicated directly to RICHARDS via online communications about it and RICHARDS stated "I'm doing the hosting, I'm doing the advertising, I'm doing everything, so I should get a larger percentage."

54. CW1 also reports RICHARDS was aware of the content of the justinsfriends website and knew it contained images of minors engaged in sexually explicit conduct including images of "Justin" when he was a minor. CW1 reports his communication with RICHARDS became more frequent in recent years when CW1 became more involved in child pornography websites such as justinsfriends.com. His communication with RICHARDS continued up until September 12, 2005 when he was actively involved in the operation of the justinsfriends website with RICHARDS. CW1 knew that RICHARDS was aware of "Justin's" age because CW1 had had direct discussions with RICHARDS about "Justin's" age and the fact that "Justin" was a minor.

55. CW1 reports RICHARDS and UM1 have been subjects in an investigation in the Boston, Massachusetts area regarding allegations involving child pornography. Lisa Tuddly, an FBI agent, confirmed that in 2000, RICHARDS and UM1 were both subjects of an investigation in the Boston, Massachusetts area for child pornography related offenses. The investigation was conducted by the Massachusetts Attorney General's office in conjunction with Somerville Police Department. The underlying investigation revealed an Internet service provider and web hosting company owned and operated by RICHARDS and UM1 called Nimenet.com was hosting child pornography websites. No arrests were made.

56. "Justin" reports that in or around the Spring of 2005, RICHARDS began exclusively hosting the justinsfriends website. "Justin" switched web hosting providers from UM1's business WEBCO.net (retaining WEBCO's credit card processing services) to RICHARDS' web hosting service. In exchange for providing "Justin" with web hosting services RICHARDS received 15% of the proceeds from subscription memberships to the justinsfriends website. In addition, "Justin" reports that RICHARDS has advertised the justinsfriends website on his own websites including caseyandkylescondo.com. In addition, RICHARDS placed a banner advertisement in June of 2005 on the justinsfriends website advertising and providing a link to RICHARDS' website caseyanddewtv.com. "Justin" also states RICHARDS uploaded videos of "Justin" as a minor engaging in sexually explicit conduct to RICHARDS' own websites. "Justin" reports RICHARDS knew he was a minor in the videos RICHARDS uploaded and advertised. In addition, "Justin" reports RICHARDS knew and has always known the justinsfriends website provided images of minor boys including "Justin" engaging

12

in sexually explicit conduct and would advertise and market the justinsfriends website with this knowledge for financial gain.

57. "Justin" states that the justinsfriends website was affiliated with Casey's websites to include caseyandkylescondo.com and caseyscondo.com. When members signed up for any of the websites they would be asked if they also wanted to join the other associated websites. This advertising increased revenue and membership subscriptions for all websites involved.

58. "Justin" states RICHARDS encouraged "Justin" to stream his live webcam shows directly to RICHARDS' websites on a regular basis. It is known in the child pornography industry that websites offering live children engaging in sexually explicit conduct generate more subscriptions than static websites without live feed.

59. During the investigation, and examination of computer record information revealed that the servers that RICHARDS used to provide web hosting services for the justinsfriends, Caseyandkylescondo.com, Caseysapartment.com, Caseyscondo.com caseyanddewtv.com websites as well others were located at the facilities of BlackSun in California.

60. BlackSun is an electronic communication service provider and has a colocation facility in Los Angeles, California. Information obtained from BlackSun confirms that RICHARDS leases server space from BlackSun. The justinsfriends.net as well as Caseyandkylescondo.com, Caseysapartment.com and Caseyscondo.com all resolve to the same IP address, 66.54.91.171 which was hosted on RICHARDS' server located at the BlackSun facilities.

61. On September 12, 2005, a search warrant was executed on the residence of CW1 and on RICHARDS' server located at BlackSun. These warrants were executed within hours of each other. When law enforcement officers entered CW1's residence, he was involved in an online communication with RICHARDS. CW1 reports RICHARDS was informing him that law enforcement had "raided" RICHARDS' server in California. RICHARDS also informed CW1 that the owner of BlackSun, a friend of his, contacted him to alert him to the law enforcement presence.

62. During the execution of the search warrant on RICHARDS' server on September 12, 2005, service to the websites was interrupted. At that time, RICHARDS contacted a BlackSun representative who referred him to a Los Angeles FBI agent who executed the warrant on RICHARDS' server. RICHARDS questioned the FBI agent about why the server was off-line and when it would be back on-line. Richard informed the FBI agent that "Zack" (last name unknown) leases four servers from BlackSun but that RICHARDS "subleases" one of the servers – the one that was subject to the search warrant. RICHARDS stated he maintains the server and is in contact with the individuals who own the websites that are on the server. RICHARDS also gave the impression he expected the justinsfriends.com website would go back online.

13

63. RICHARDS has been independently identified by the FBI as TIMOTHY RYAN RICHARDS through the Florida Department of Motor Vehicles, in which the photograph on the driver's license was compare to the website images of "Casey." RICHARDS' date of birth is          1981 and his social security number is          -2376. Richard resides at                   Nashville, Tennessee

64. Dunn and Bradstreet reports indicate that UM1 and RICHARDS are business associates, both of whom are listed for the nimenet web hosting service. Investigative interviews with CW1 as well as information obtained during the Massachusetts Attorney General's investigation indicate that the individuals went to high school together in Maryland and attended college together in Massachusetts.

65. On September 20, 2005, surveillance was conducted on RICHARDS' residence at                   Nashville, Tennessee and agents observed RICHARDS exit his vehicle and enter the residence. At that time, agents observed RICHARDS with a teenage boy. Agents also observed a vehicle at the residence and described it as a red sports utility vehicle with Florida tag X00TXB. This vehicle was first observed at the residence on September 18, 2005. The vehicle is registered to TIMOTHY RICHARDS listing the address                   Zephyrhills, Florida

## CONCLUSION

66. Based upon the information above, I have probable cause to believe that violations of Title 18, United States Code, Sections 2251(d) and 2252A(a)(1) have been committed by TIMOTHY RICHARDS.

*C. Ricky Roll*
C. Ricky Roll
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn to before me this 22nd day of September, 2005.

United States Magistrate Judge

14